**UNITED STATES of America,**

v.

**Laurel M. BAYLEY et al., including
Grover Cooper, Defendants.**

United States District Court
S. D. New York.
April 21, 1965.

Robert M. Morgenthau, U. S. Atty., John E. Sprizzo, Robert L. King, Asst. U. S. Attys., of counsel, for the United States of America.

Marguerite S. Hines, New York City, for defendant Grover Cooper.

WYATT, District Judge.

This is a motion by defendant Grover Cooper for the suppression as evidence and for the return to him of certain papers. Fed.R.Crim.P. 41(e)

Evidence was taken at a hearing held on March 27, 1965.

The papers were seized by employees (who testified that they were "inspectors") of the Internal Revenue Service at the time of their execution, on October 8, 1962, of a warrant for the arrest of Cooper on a sworn complaint charging him with making (on or about March 6, 1962) false statements in a matter within the jurisdiction of the Internal Revenue Service. The false statements charged were that a $9,118 tax refund was due to Percy Branker when Cooper knew that such a tax refund was not in fact due. The statute, not cited in the complaint, is 18 U.S.C. § 1001.

There was no search warrant.

At the hearing an inventory of the papers was received and notation made thereon of certain papers which the government consented to return and did so return at the time. These returned papers are suppressed as evidence on consent of the government.

This is the decision of the motion directed to the remaining papers.

The contention for Cooper is (1) that the arrest was unlawful because the complaint did not show probable cause to justify the issuance of a warrant and (2) that, even if the arrest were lawful, the search was not reasonable as incident thereto because of the nature and scope of the area searched.

## 1.

The facts as found are as follows:

A sworn complaint of Stolzenthaler, an inspector of the Internal Revenue Service, was submitted to the Commissioner who on the basis thereof issued a warrant for the arrest of Cooper.

At about 8:30 in the evening of October 8, 1962, four inspectors—Stolzenthaler, Doyle, Mulroy and Taylor—went to Cooper's home at 287 Washington Place, Englewood, New Jersey. Their purpose was to execute the warrant, which was in the possession of Stolzenthaler. It is assumed that they were not wearing uniforms.

The home of Cooper is a detached house, all rooms on one floor. There is a front door opening into a living room, a back door opening from the kitchen, and perhaps a side door. There are two bedrooms (one used by Cooper and his wife, the other a "spare" or guest room), a bathroom, and a den.

On the evening in question, Cooper and his wife were in the house and had a guest.

Stolzenthaler and Doyle went to the front door and rang the bell without result; they then knocked on the door with increasing loudness. Mulroy and Taylor had gone near the back door. After hearing the knocking at the front door, these two inspectors observed that the lights in the kitchen went out, the back door then opened, then the aluminum screen door, and a man appeared. The two inspectors went up the stairs, addressed the man and learned that he was Cooper. They told him that they were Treasury inspectors, that a warrant for his arrest had been issued, and that the warrant was in the hands of an inspector then at the front door. They started through the kitchen toward the front of the house. Meanwhile the two inspectors at the front door had finally been admitted and thus met Cooper in the living room. Stolzenthaler identified himself to Cooper, showed his badge and said that he had a warrant for Cooper's arrest. It was then about ten or fifteen minutes after the officers first came up to the outside of the house.

Cooper asked the officers to come with him to his bedroom, entry to which was by a door from the living room; he explained that he did not want his wife (who, he said, was not well) to be upset and that they had a guest or guests. Doyle remained in the kitchen with Mrs. Cooper. The other inspectors went with Cooper to the bedroom.

In the bedroom, Stolzenthaler gave Cooper the warrant and the complaint and, after Cooper had read these, Stolzenthaler told him that he was under arrest, to sit down on the bed, to take it easy, etc. Stolzenthaler then told Taylor and Mulroy to search the bedroom. They did so, searching all chests of drawers in the room and two closets with clothes, also a metal strong box. As a result of the search, the inspectors seized a brief case, notebooks, at least one address book, and a number of papers, including tax returns, W-2 tax forms, other Internal Revenue Service forms, business cards, slips of paper with names and telephone numbers, etc. They took nothing except from the bedroom or its closets. The search of the bedroom lasted about an hour and a quarter or an hour and a half.

When the officers first began to search, Cooper stood up or jumped up and objected but then sat back down. Some ten minutes or so later and at a time when Stolzenthaler had left the bedroom, Cooper objected to the searching of an end table, whereupon Taylor put handcuffs on him. Before leaving the house and at Cooper's request, the handcuffs were removed.

After searching the bedroom the inspectors went with Cooper to his garage where they searched his automobile but took nothing. They then left the premises, with Cooper.

### 2.

Because the search without a warrant is in this instance sought to be justified as incident to a lawful arrest, the first issue is whether the arrest warrant was valid and thus the arrest thereunder lawful. .

■ The arrest warrant is valid if the complaint shows "probable cause to believe that an offense has been committed and that the defendant has committed it". Fed.R.Crim.P. 4(a)

■ The complaint here contains nothing which even remotely shows probable cause. There are two paragraphs in the body of the complaint. The first states in one sentence, in the language of the statute or of an indictment, the conclusion that three defendants, including Cooper, "did unlawfully * * * make false * * * statements * * * to the effect that an income tax refund in the amount of $9,118.00 was due and owing to Percy Branker * * * whereas in truth * * * said income tax refund was not then due and owing * * * *". No fact or circumstance is set forth to enable the Commissioner to determine whether probable cause existed to believe that this conclusion is true. The complaint is plainly inadequate.

The second paragraph merely states that the conclusion in the first paragraph is based on "investigations" of Stolzenthaler, "including * * * a statement signed by the defendant Ethel Ivy Neely". It is not claimed by the government that the Neely statement (which was sworn to) was submitted to the Commissioner, and the complaint indicates that it was not so submitted. If the facts contained in the Neely statement had been set out in the complaint, then failure to submit the Neely statement might not be significant. But mere reference to the Neely statement does not inform the Commissioner of its contents, and thus adds nothing to the complaint.

It may be noted in passing that even if the Neely statement were incorporated in the complaint, the latter would not be made sufficient because the Neely statement deals with a specific Branker transaction *different* from that contained in the complaint. The Neely statement gives facts as to a Branker tax return calling "for a refund of $9,236.15" (evidently the return made the subject of count 49 of the indictment returned October 8, 1964). The complaint, however, charges an offense involving a Branker tax refund "in the amount of $9,118.00" (evidently the refund made the subject of count 48 of the indictment).

It seems plain that this complaint is "purely conclusory", an expression used by Mr. Justice Goldberg in United States v. Ventresca, 85 S.Ct. 741, 746 (1965).

The arrest warrant, having been issued on an insufficient complaint, is invalid.

The arrest of Cooper cannot be shown by such a warrant to have been lawful.

### 3.

█ The arrest of Cooper may, however, be lawful as one made without a warrant. An arrest under an invalid warrant will nevertheless be lawful if the arrest might have been lawfully made without a warrant.

The leading case on this point seems to be Stallings v. Splain, 253 U.S. 339, 40 S.Ct. 537, 64 L.Ed. 940 (1920). The opinion assumes that the warrant under which the arrest was made, having been issued to the Marshal for the District of Wyoming, was not effective within the District of Columbia where the arrest was made. Mr. Justice Brandeis said however (at 342, 40 S.Ct. at 538):

"If the bench warrant issued in Wyoming was not effective as a warrant within the District of Columbia, the possession of it did not render illegal an arrest which could lawfully have been made without it."

This principle was followed by our Court of Appeals in a well known and interesting case some years ago. A government agent had an arrest warrant but claimed that he did not use it in making the arrest; there was a dispute on this point. A seizure of documents was sought to be justified by the government as incident to a lawful arrest without a warrant; no attempt was made to sustain the warrant. The argument against the seizure was that "an arresting officer who purports to act under a warrant may not justify on any other ground" (40 F.2d at 595). This argument was rejected by the Court of Appeals, saying: " * * * if it be assumed that O'Brien purported to act under the warrant, the contention that he may not otherwise justify cannot be sustained". United States v. Gowen, 40 F.2d 593, 595 (2d Cir. 1930), reversed on other grounds, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). The arrest was held lawful, treating the prohibition agents there involved as private individuals because of an attack on their author-ity to arrest as officers or peace officers. The Supreme Court assumed, for purposes of its decision, that the arrest was lawful.

See also In re Phoenix Cereal Beverage Co. Inc., 58 F.2d 953 (2d Cir. 1932) and the dissenting opinion of Judge Learned Hand (58 F.2d at 958).

### 4.

It must now be determined whether the arrest of Cooper can be found lawful as made without a warrant.

### a.

█ Did inspector Stolzenthaler have authority as an officer or peace officer to arrest Cooper without a warrant? The government cites no *federal statute* conferring such authority. 26 U.S.C. § 7608(a) is not applicable because Stolzenthaler is not claimed to have been charged with any duties under "subtitle E" (26 U.S.C. §§ 5001–5862) or under any other law pertaining to the "commodities subject to tax under such subtitle". The government says that Stolzenthaler was one of the "Inspectors in the Internal Security Division of the Internal Revenue Service" (memo, p. 7). It is assumed that this is the equivalent of a "criminal investigator" but 26 U.S.C. § 7608(b) is not applicable because this sub-section became effective October 23, 1962, and the arrest here in question took place on October 8, 1962.

It is unnecessary to consider the cases cited for the government on this point and claimed to support the authority of the agents here. They appear to deal with authority to execute warrants, or involve narcotics, or "subtitle E" offenses. I am not willing to accept these decisions if they can be read as finding in 26 U.S.C. § 7803(a) authority for these inspectors to arrest without a warrant.

█ The situation at bar is controlled by the rule laid down in United States v. Di Re, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948) that where there is no applicable federal statute, the validity of an arrest without a warrant is to be

determined by the law of the State in which the arrest is made. See United States v. Viale, 312 F.2d 595 (2d Cir. 1963), cert. denied 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963), where the validity of arrests without warrant by "Special Agents of the Internal Revenue Service" (312 F.2d at 598) were determined by reference to the law of New York where the arrests were made.

b.

Did Stolzenthaler have authority under the law of New Jersey to arrest Cooper without a warrant?

■ Research has not disclosed any relevant New Jersey statute. There are provisions as to arrest for certain specific offenses, but generally the validity of an arrest in New Jersey is determined by the common law. The problem is thoroughly discussed, with reference to search and seizure problems in the wake of Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in State v. Smith, 37 N.J. 481, 181 A.2d 761 (1962).

■■ A "peace officer" in New Jersey has the common law right "to arrest, without warrant, one whom he suspects to be guilty of felony, although it afterwards appears that no felony was committed, provided he has reasonable cause to suspect that the person arrested has committed a felony." Brown v. State, 62 N.J.L. 666, 42 A. 811, 820 (Ct.Err. & App.), affirmed 175 U.S. 172, 20 S.Ct. 77, 44 L.Ed. 119 (1899). It seems clear that inspectors of the Internal Revenue Service are not "peace officers" in New Jersey. N.J.S.A. 2A:154–1 through 154–3.

The arrest of Cooper must be tested therefore on the basis that it was made by a private person.

c.

Absent any statutory authority in New Jersey, resort must be had to the common law concerning the right of a private person to arrest without a warrant for a felony not committed in the presence of such private person. (The offense—violation of 18 U.S.C. § 1001—

on account of which Stolzenthaler arrested Cooper is a felony).

■ The common law rule was summed up by Judge Learned Hand in United States v. Coplon, 185 F.2d 629, 634, 28 A.L.R.2d 1041 (2d Cir. 1950), cert. denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952) as follows:

> "At common law a private person, as distinct from a peace officer, had the power to arrest without warrant for a felony, committed in his presence, and for one, actually committed in the past, if he had reasonable ground to suppose that it had been committed by the person whom he arrested."

See also 4 Wharton's Criminal Law and Procedure (Anderson ed.) 256 and following: Hall, Legal and Social Aspects of Arrest Without a Warrant, 49 Harv.L. Rev. 566 (1936); Wilgus, Arrest Without A Warrant, 22 Mich.L.Rev. 541, 22 Mich.L.Rev. 673, 686 and following, 22 Mich.L.Rev. 798 (1924).

This seems to be accepted as the common law rule in New Jersey, although no case so holding has been found. The discussion in the cases is dicta.

In Brown v. State, above, the Court declared:

> "At common law a peace officer has a right to arrest, without warrant, one whom he suspects to be guilty of felony, although it afterwards appears that no felony was committed, provided he has reasonable cause to suspect that the person arrested has committed a felony. There is this distinction between a private individual and a constable: In order to justify the former [private individual] in causing the imprisonment of a person, he must not only make out a reasonable ground of suspicion, *but he must prove that a felony was actually committed;* whereas, a constable, having reasonable ground to suspect that a felony has been committed, is authorized to detain the party suspected until inquiry can be

made by the proper authorities." (Emphasis supplied.)

A fairly recent decision of the Essex County Court, citing Brown v. State, above, with approval, has this to say:

"At common law a police officer has a right to arrest, without a warrant, one whom he suspects to be guilty of a felony, provided he has reasonable cause to suspect that the person arrested has committed the felony. In the case of an arrest by a private person, there must be proof that a felony was actually committed, whereas an officer may arrest upon reasonable suspicion that a crime has been committed and that the person arrested is the person who committed the suspected crime." State v. Scrotsky, 77 N.J.Super. 42, 185 A.2d 254, 256 (1962)

The view has been expressed in New Jersey that at common law a private individual may not arrest without a warrant for a felony unless the felony is committed in his presence. Ex parte Sifola, 101 N.J.Eq. 540, 138 A. 369, 370 (Ch.1927), cited with "cf." in State v. Smith, 32 N.J. 501, 161 A.2d 520, 536 (1960). Because of the many authorities outside New Jersey which take a contrary view as to the common law, the view expressed in Ex parte Sifola is not accepted by me as representing the present law of New Jersey on the point.

■ It is concluded, therefore, that under the law of New Jersey a private person may lawfully arrest for a felony not committed in his presence if (1) a felony has actually been committed and (2) the private person has probable cause to believe that the person arrested committed the felony.

#### d.

On the present record, neither of these elements can be found to exist in respect of the felony for which Cooper was in fact arrested—making false statements that an income tax refund of $9,118.00 was due to Percy Branker. That these elements might have existed at the time in respect of another alleged felony—namely, a false income tax refund claim of Branker of $9,236.15—is of no moment because Cooper was not arrested for this offense.

If decision of the present motion turned on existence of the two elements which normally would justify this arrest by a private person, then further evidence could be taken on the point.

#### e.

But under the circumstances here, proof of these elements would make lawful neither the arrest nor the search and seizure incident thereto.

The situation is that on the strength of an invalid warrant of arrest, Internal Revenue Service inspectors—having no authority to execute even a valid warrant—entered at night the dwelling house of Cooper, arrested him, searched his bedroom and seized numerous papers. This seems clearly an unlawful entry and a violation of the Fourth Amendment.

Research has turned up no statement that a private person may nowadays lawfully enter the home of another at night to arrest him for a felony committed by him in the past.

There are statements that at common law when a private person has the right to arrest for a felony (under the conditions having already been set out above) such private person "may break open doors, if he be denied entrance, and if de facto the felon be there, for the law makes him an officer in this case as well as if he were a constable". 2 Hale P.C.c.x, (ed. 1778) p. 77, quoted in Wilgus, cited above at 804.

If such was the rule in the Middle Ages, it is understandable because of the violent nature of the crimes called "felonies" at common law: murder, manslaughter, rape, arson, burglary, robbery, larceny, mayhem, sodomy, and prison breach when imprisoned for a felony. 1 Wharton cited above, § 28. These were "bootless" crimes, that is, not to be satisfied by "boot" (compensation to the injured); for such bootless crimes, or fel-

onies, "life and limb and estate" were "at the mercy of the king". Wilgus, same citation as above, at 569. Such crimes as abortion, bribing voters, forgery, perjury, and obstructing justice, were misdemeanors at common law while, for example, embezzlement and obtaining money by false pretenses were not even offenses at common law. Wilgus, cited above, at 573.

There is thus a vast difference between felonies at common law, when arrests by private citizens came to be regarded in some cases as lawful, and felonies under the Act of Congress (18 U.S.C. § 1) which include any offense punishable by imprisonment for more than one year.

It may well have been a wise policy of the common law to permit or encourage private citizens to arrest a common law felon in his home. Every reason of policy seems against permitting a private citizen in this century to go to a man's home at night and arrest him for making false statements to the Internal Revenue Service. In this connection, the words of Judge Learned Hand are brought to mind:

"The feelings which lie behind it [the Fourth Amendment privilege against unreasonable searches and seizures] have their basis in the resentment, inevitable in a free society, against the invasion of a man's privacy without some judicial sanction". United States v. Rabinowitz, 176 F.2d 732, 735 (2d Cir. 1949), reversed 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950)

The truth of the quoted statement is not affected by the reversal of the decision.

The common law rule as to arrest by a private person for a felony grew up in the England of roughly the twelfth to the seventeenth centuries in a comparatively primitive society and, as shown above, when felonies were few and of so violent a character that immediate apprehension of the felon was felt necessary to preserve order. That rule has no relevance to present day conditions. This thought is expressed in a very recent note "The Law of Citizen's Arrest", 65 Colum.L.Rev. 502, 505 (1965) as follows:

"Temporal limitations on citizen's arrest properly serve to compel reliance upon the police once the danger of immediate public harm from criminal activity has ceased. There is a serious question, however, whether the traditional common-law rules are sufficiently restrictive in a society that places the primary responsibility for apprehending criminals in the hands of professional law enforcement officers. First, the rule that a felon is subject to citizen's arrest at any time seems too broad. Those who have committed statutory felonies like bribery, forgery or embezzlement have not demonstrated that they represent an immediate danger to the public that would warrant unrestricted private apprehension."

The Fourth Amendment makes the people "secure in their * * * houses" against unreasonable arrest of their "persons" therein, just as much as it protects against unreasonable searches and seizures of papers. See United States ex rel. Potts v. Rabb, 141 F.2d 45, 46 n. 1 (3rd Cir. 1944).

In this connection, it should be noted that in United States v. Viale, cited above, arrests without warrant and search of certain defendants by Special Agents of the Internal Revenue Service were upheld by our Court of Appeals although made in a house (whether occupied as a home did not appear). The agents were treated, for purposes of the decision, as private persons. But the important point is that in Viale the entry of the agents on the premises was lawful; they had a valid search warrant for the premises and a valid warrant for the arrest of the owner, which they executed. They were thus lawfully in the house where the arrests without warrant of the other defendants were made.

Whatever may have been the rule in seventeenth century England, this Court believes that it is unlawful today

for a private citizen to go to a home at night to arrest the occupant for a statutory felony already committed and completed in the past. It follows that Government agents having no authority as such to arrest may not lawfully go to a man's home with an invalid arrest warrant and arrest him.

▆▆▆ The arrest of Cooper was unlawful therefore and the incidental search unreasonable.

Assuming, however, that the arrest of Cooper was lawful, both the search and seizure were in any event unreasonable and thus unlawful under the Fourth Amendment.

Both Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), are instructive.

In each case there were valid warrants of arrest, executed in Harris in his apartment and in Rabinowitz in his one room office or store. In each case, a search and seizure incident to the arrest was sustained.

It should perhaps first be noted that the Court was sharply divided in each case: 5 to 4 in Harris, 5 to 3 in Rabinowitz. Considering the changes in the Court's composition since those decisions, it is problematical, if not doubtful, whether they are good law today.

Two factors were emphasized in Harris, which are not present in the case at bar: (1) "the agents entered the apartment under the authority of lawful warrants of arrest" (331 U.S. at 153, 67 S.Ct. at 1102) and (2) "the objects sought for and those actually discovered" were not "evidentiary materials" and the objects seized were "property * * * in the illegal custody of the petitioner" who was thus "guilty of a serious and *continuing* offense against the laws of the United States" (331 U.S. at 154, 155, 67 S.Ct. at 1103; emphasis supplied). It was also noted that "Stricter requirements of reasonableness may apply where a dwelling is being searched." (331 U.S. at 151 n. 15, 67 S.Ct. at 1102).

The character of the objects seized in Rabinowitz was the same as in Harris; the objects were "forged and altered stamps" the possession of which "was a crime, just as it is a crime to possess burglars' tools, lottery tickets or counterfeit money" (339 U.S. at 64, 70 S.Ct. at 434).

It was also emphasized in Rabinowitz that "the place of the search was a business room to which the public, including the officers, was invited" (339 U.S. at 64, 70 S.Ct. at 424).

In the two cases discussed, the search was by officers with authority to arrest. Recognizing that in this Circuit, a private person may search incidental to an arrest (United States v. Viale, cited above), it may still be more difficult for a private person than for an authorized officer to justify a search, especially where the private person has searched a part of a dwelling house at night. The cases in this Circuit which have upheld the right of a private person to search have not involved any entry without authority of a warrant into a dwelling house. In United States v. Viale, above, there was a valid arrest warrant and a valid search warrant. In United States v. Park Avenue Pharmacy, 56 F.2d 753, 756 (2d Cir. 1932), the search was of the *person* arrested, who was in a store, apparently in the daytime. In Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, 754 (1951), cert. denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952), cited on this point with approval in United States v. Viale, above, 312 F.2d at 600, the search was of the person arrested, who was on a public street.

▆▆▆ Moreover, despite the overruling of Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948) by Rabinowitz, above, the failure to procure a search warrant where (as here) it was practicable to do so is *a* factor which may still be considered in determining the reasonableness of the search. See United States v. Rabinowitz, above, 339 U.S. at 65–66, 70 S.Ct. 430.

In the case at bar, the offense for which Cooper was arrested was a very simple

one as described in the complaint—making false statements that an income tax refund of $9,118.00 was due to Percy Branker. After an arrest for such an offense, there could be no search for the "fruits of crime such as stolen property" (331 U.S. at 154, 67 S.Ct. at 1103) because the arrest was not for theft; it would not be an element of the offense for which Cooper was arrested that any tax refund money was in fact received. There could be no search for "property the possession of which is a crime" (331 U.S. at 154, 67 S.Ct. at 1103), such as narcotics, because Cooper was not being arrested for any such crime. There might have been a search for "weapons by which the escape of the person arrested might be effected" (331 U.S. at 154, 67 S.Ct. at 1103) but there seems in fact to have been no such search, nor any necessity for one. Cooper made no resistance nor attempt to escape and his verbal protest at the searching was answered by handcuffing. There was no evidence that his person was ever searched, the first place normally to be searched for weapons (the "frisk"). It is difficult to believe that the search was for "the instrumentalities and means by which a crime is committed" (331 U.S. at 154, 67 S.Ct. at 1103). The use of the expression "a crime" (emphasis supplied) in the quoted phrase definitely does not imply that the search may be for the means by which any crime is committed. The search (as opposed to seizure) may only be for the means by which the crime is committed for which the arrest is made. The following from United States v. Agnello, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925), was quoted with approval in Harris, above, 331 U.S. at 151, 67 S.Ct. at 1101:

> "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well

as weapons and other things to effect an escape from custody is not to be doubted." (Emphasis supplied.)

It should be noted again that Harris was a 5–4 decision and that Mr. Justice Frankfurter was passionate in dissent. His dissent recognized the basic assumption of the majority, as just noted (331 U.S. at 164, 67 S.Ct. at 1108):

> "It is also assumed that because the search was allegedly for instruments of the crime for which Harris was arrested it was ipso facto justified as an incident of the arrest." (Emphasis supplied.)

The crime here charged was very specific: "false statements * * * in a matter within the jurisdiction of * * the Internal Revenue Service". The "instrumentalities and means" would seem to be writings submitted to the Service, not papers kept in Cooper's home.

▮ The search being unreasonable, the seizures were necessarily unreasonable. Abel v. United States, 362 U.S. 217, 234–235, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

But even if the search were reasonable, the seizures were here unreasonable.

▮ The papers seized, as set forth in the inventory, seem to have no connection whatever with the offense for which Cooper was arrested, and thus are not apparently even evidence of the commission of that offense. The name of Branker does not seem to appear in the papers. Certainly the papers seized were not contraband and whether they were evidence of the offense for which Cooper was arrested or evidence of some other offense is of no moment. Search for and seizure of mere evidence is always unreasonable. This principle is fully discussed by Judge Bryan in United States v. Stern, 225 F.Supp. 187, 189–195 (S.D. N.Y.1964).

The nature of the search, the place, the character of the articles seized—personal and business papers—require a conclusion that there was "a lawless inva-

sion of the premises and a general exploratory search in the hope that evidence of crime might be found." Go-Bart Importing Co. v. United States, 282 U.S. 344, 358, 51 S.Ct. 153, 158, 75 L.Ed. 55 (1931).

For the reasons above set forth, the motion by Grover Cooper is granted, the papers and any other articles seized in his home on October 8, 1962 are directed to be returned to him, and they are suppressed for use as evidence.

So ordered.