Donald P. SCANLON, Plaintiff,

v.

Richard H. FLYNN, Defendant.

Donald P. SCANLON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 76 Civ. 5383, 77 Civ. 3797.

United States District Court, S. D. New York.

Dec. 22, 1978.

As Amended March 29, 1979.

Dublirer, Haydon & Straci, New York City, Fitzgerald, McGahan, Travis & Crisona, New York City, for plaintiff; Paul A. Victor, Bruce J. Cooper, New York City, of counsel.

Judge, Livoti & Bernstein, New York City, Trial Counsel for Berman & Vladimir, New York City, for defendant Richard H. Flynn; Christopher M. Houlihan, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendant United States of America; Carl T. Solberg, Patrick H. Barth, New York City, of counsel.

LASKER, District Judge.

Shortly after eleven on the evening of October 6, 1975, two automobiles collided at the intersection of Park Avenue and Sixty-first Street in Manhattan. One car, owned by the United States and operated by Richard Flynn, an agent of the Bureau of Alcohol, Tobacco, and Firearms, came to rest at the southwest corner of the intersection. The other, owned and operated by Donald Scanlon, continued south on Park Avenue and then west on Sixtieth Street. Agent Flynn, alighting from his vehicle, gave chase on foot, fired his revolver at least once, and arrested Scanlon on Sixtieth Street just east of Madison Avenue.

Scanlon, a partner in a Wall Street brokerage firm, was charged with driving while intoxicated, leaving the scene of an accident, and assault. He was arraigned and released the next afternoon, and in April, 1976, the charges against him were dismissed without prejudice. Although shortly thereafter the District Attorney announced his intention to present the case to the grand jury, apparently nothing has come of it since.

Scanlon sues Flynn and the United States for negligent operation of an automobile, assault, false arrest, and malicious prosecution. The defendants have asserted a counterclaim, alleging that Scanlon rather than Flynn was to blame for the collision.[1]

### 1. Negligence

■ The untoward events of October sixth began with a simple automobile accident. Scanlon on the one hand and Flynn and the United States on the other seek recovery for personal injuries and property damage caused by the collision. Liability turns on a single issue: Which driver had the green light?

Scanlon testified that he had stopped for a light at Sixty-fourth and Park before turning south on Park, and then again at Sixty-third and Park. When the light at Sixty-third turned green, all the lights south as far at least as Fifty-ninth Street also turned green. Scanlon proceeded south. As he approached the Regency Hotel on the northwest corner of the intersection of Sixty-first and Park, he glanced toward it to see whether any cabs or limousines were entering traffic. He did not see Flynn's car until moments before impact.

Flynn testified that travelling west on Sixty-first Street he stopped for the light at Park. When the light turned green he proceeded into the intersection and was struck broadside by Scanlon's car.

This is the principal evidence relating to the issue of negligence. The other evidence bearing on who had the red light is inconclusive.[2] Clearly Mr. Scanlon and Agent Flynn cannot both be right, but the evidence does not establish which is mistaken. In short, neither has shown by a preponderance of the evidence that the other was negligent, and consequently neither Scanlon nor Flynn and the United States can recover for personal injuries or property damage.

### 2. Assault

■ Agent Flynn admits that he fired once at Scanlon's automobile. He extricated himself from his car as soon as it came to rest, then saw Scanlon's station wagon about one quarter of the way down the block, moving "fairly slow." Correctly surmising that this was the car that had hit him, and concerned because it did not appear to be stopping, he ran after it.

According to Flynn, Scanlon's car moved left at Sixtieth Street and Park, as if to turn east, then made an arc around to the west. Flynn testified that by this time he had moved into the intersection at Sixtieth, and the car seemed to be coming directly towards him. Believing that the driver intended to run him down, Flynn turned and moved to the sidewalk. As he turned, he concluded that he would have to fire at the car in order to protect himself, and he

---

1. Scanlon's action against Agent Flynn was commenced in New York State Supreme Court and removed to this court pursuant to 28 U.S.C. § 1442.

 His action against the United States is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671—2680 (1976). Jurisdiction is based on 28 U.S.C. § 1346(b).

2. In addition to the testimony of the principals, Leon Marrano, a friend of Scanlon's who was following him in another automobile at the time of the accident, testified that the light was green for Scanlon. Mr. Marrano and Scanlon have discussed the accident on many occasions during the years since the accident, and his recollection and Scanlon's seem to be essentially one.

 It was established that on the night of the accident the lights on Park Avenue from above Sixty-third south beyond Sixtieth were set to change simultaneously. Rosendo Montalvo, doorman at the building on the southwest corner of the intersection of Sixty-first and Park, testified that after the collision, as Scanlon's car was proceeding towards Sixtieth, the light at Sixtieth changed from red to green, indicating that unless the lights had run through a complete sequence while Scanlon's car moved from Sixty-first to Sixtieth, the light at Sixty-first was red for Scanlon at the time of the collision. However, Mr. Montalvo's recollection of events was extremely confused, and cannot be heavily credited. Moreover, Charles McGettigan, who was walking west on Sixtieth toward Park when he heard the collision, testified at his deposition that after he heard it he saw that the light at Sixtieth was "green going down Park Avenue." C. McGettigan Deposition at 5. Taken together, these witnesses' testimony provides too little insight to support a finding either way.

pulled his revolver. When he turned again to face the station wagon, however, it was seven to fifteen yards beyond him, moving west on Sixtieth. Nonetheless, Flynn fired by reflex, striking the lower panel of the right rear door of Scanlon's automobile. Several witnesses confirmed that Flynn had fired a shot west down Sixtieth. Flynn then commandeered a passing tow truck, caught up with the station wagon, which he contends was stopped in traffic on Sixtieth, and arrested Scanlon.

Scanlon's version of events differs in several significant particulars. Scanlon contends that Flynn fired at least twice, once immediately after getting out of his car, and then again at Sixtieth Street. Scanlon testified that he was dazed by the collision and did not regain full awareness until he was some ways down Park Avenue towards Sixtieth. When he did, he glanced in his rear view mirror, saw a man assume a crouched firing position, and heard a sharp report like that of a starter's pistol. Terrified, Scanlon turned west on Sixtieth, but when he saw the flashing lights of the tow truck he assumed that help had arrived, pulled over, and stepped out of his car. Flynn, alighting from the tow truck with his pistol drawn, identified himself as a federal agent, arrested and handcuffed Scanlon, and escorted him back to Park, where police officers were just arriving on the scene.

Scanlon testified that he neither saw nor heard Flynn's shot down Sixtieth Street. Since he cannot recover for an "assault" of which he was unaware, Scanlon's cause of action for assault is predicated on the earlier shot which he contends Flynn fired down Park Avenue. The testimony of witnesses was far from uniform on the issue of this alleged earlier shot, but taken as a body it might well support a finding that the shooting did occur. However, only one shell and one slug were recovered, and when Flynn unloaded his pistol for the police at the scene, he removed five live cartridges from the revolver's six chambers. Flynn testified that he had no ammunition with him on October sixth other than the six rounds in his weapon. The fact that a subsequent ballistics test revealed evidence of discharge in two chambers may be explained by the fact that the last time Flynn had cleaned the pistol he had done so hurriedly. In light of these factors, Scanlon's claim that Flynn fired an earlier shot down Park Avenue shortly after getting out of his car is not supported by a preponderance of the evidence. Consequently, Scanlon's cause of action for assault must be dismissed.

### 3. False Arrest and Imprisonment

■■■■ Agent Flynn's authority to arrest Scanlon for violations of state law depends on whether he acted as a "peace officer" within the meaning of New York's Criminal Procedure Law or as a private citizen. *See United States v. Di Re*, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *accord, United States v. Viale*, 312 F.2d 595, 599 (2d Cir.), *cert. denied*, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963). Since the arrest was effected without a warrant, it is presumed unlawful, and Flynn bears "the burden of proving legal justification as an affirmative defense." *Broughton v. State*, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, 315, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975); *accord, Smith v. County of Nassau*, 34 N.Y.2d 18, 23, 355 N.Y.S.2d 349, 352, 311 N.E.2d 489, 492 (1974); *Woodson v. New York City Housing Authority*, 10 N.Y.2d 30, 33, 217 N.Y.S.2d 31, 32, 176 N.E.2d 57, 58 (1961). If Flynn, as an agent of the Bureau of Alcohol, Tobacco, and Firearms, was a "peace officer," he may justify the arrest by showing that he had reasonable cause to believe that Scanlon had committed the offenses for which he was arrested. N.Y. Crim.Proc.Law § 140.25 (McKinney 1971). If Flynn acted as a private citizen, however, he can justify the arrest only by showing that Scanlon *in fact* committed those crimes. *Id.* § 140.30; *Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 474, 334 N.Y. S.2d 632, 639, 285 N.E.2d 871, 875 (1972).

As defined in the Criminal Procedure Law, the term "peace officer" does not encompass federal agents of any kind. N.Y. Crim.Proc.Law § 1.20[33] (McKinney 1971 &

Supp.1978–1979). Nonetheless, in *United States v. Perez*, 242 F.2d 867 (2d Cir.) *cert. denied*, 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957), the Second Circuit upheld an arrest by agents of the Federal Bureau of Narcotics on the ground that "[u]nder New York law a law enforcement officer may make an arrest without a warrant when a felony has been committed, and the arresting officer has reasonable cause for believing the person to be arrested has committed it." *Id.* at 869 (citing the predecessor to N.Y.Crim.Proc.Law § 140.-25). Noting that this holding was "plainly wrong," the Second Circuit overruled *Perez* in *United States v. Viale*, 312 F.2d 595 (2d Cir.), *cert. denied*, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963), which firmly established that in the absence of an applicable federal statute authorizing a federal agent to make an arrest, his authority to do so is that of a private citizen under state law. *Id.* at 599–600; *accord, United States v. Reid*, 517 F.2d 953, 960 (2d Cir. 1975) (Friendly, J.) (dictum); *United States v. Heliczer*, 373 F.2d 241, 244–45 (2d Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); *United States v. Hou Wan Lee*, 264 F.Supp. 804, 807–08 (S.D.N.Y. 1967) (Mansfield, J.).

Despite this rule, Flynn argues that his authority to arrest Scanlon was that of a "peace officer." Flynn relies on *United States v. Reid*, 517 F.2d 953 (2d Cir. 1975). In *Reid*, Judge Friendly held that an agent of the Drug Enforcement Administration who interrupted a haircut when he heard a commotion in the liquor store next to the barber shop, and was shot while attempting to arrest the two men who were beating and robbing the proprietor, was assaulted "while engaged in or on account of the performance of his duties," and consequently that the man who shot him was properly convicted under 18 U.S.C. § 111 for assaulting a federal officer. 517 F.2d at 964. Noting that federal agents are expected to respond to violations of state law, and that "[p]ublic opinion would [be] properly offended" if they did not, Judge Friendly stated that when "'federal law enforcement officers do what they are properly expected to do in the enforcement of state criminal laws, they should have the same federal protection they would receive in the performance of their other duties.'" *Id.*

However, the authority to arrest without warrant on probable cause alone is not a "protection," but a prerogative. State and federal arrest statutes protect private citizens from improper interference with their liberty. They balance the individual's interest in liberty against the legitimate law enforcement needs of government; they are not intended to protect law enforcement personnel from liability for false arrest. If the New York legislature wishes to authorize federal agents to make arrests on "reasonable cause" it can do so. It has not, but rather has chosen to hold them to the standards that apply to private citizens. Accordingly, Agent Flynn's arrest of Scanlon must be measured against those standards.

 Under New York law, a private citizen who makes an arrest does so at his peril. If the person arrested did not in fact commit the crime for which he is arrested, the person who arrests him is liable even if he acts in good faith or has probable cause to make the arrest. N.Y.Crim.Proc.Law § 140.30 (McKinney 1971). Flynn arrested Scanlon for driving while intoxicated, leaving the scene of an accident, and assault. He has not shown, however, that Scanlon committed any of these offenses.

Although Flynn testified that when he arrested Scanlon "[t]here was a strong aroma of alcohol on his breath and his eyes were glassy," Trial Transcript at 292, this was not corroborated by any other witness. Moreover, Scanlon was given a coordination test shortly after his arrest. The officer who administered the test concluded that Scanlon was not intoxicated. Apparently aware that the evidence does not support a conclusion that Scanlon was driving while intoxicated, Flynn does not press the point.

New York law requires any person involved in an automobile accident to stop and identify himself. N.Y.Veh. & Traf.Law § 600 (McKinney Supp.1978–1979). Scanlon

testified that following the collision he had begun to pull over when he saw Flynn firing at him in his rear view mirror. In such circumstances, a motorist's failure to stop immediately would clearly be excusable. Although Scanlon did not show by a preponderance of the evidence that Flynn did fire at him before he turned onto Sixtieth Street, Flynn did not show by a preponderance that no such shot took place. It is possible that Scanlon's recollection that the shot occurred before he turned the corner is confused, and that what he really saw in his rear view mirror was the shot that clearly did take place, at the corner of Sixtieth Street. If so, his dazed condition clearly excuses his failure to stop within seconds of the accident. *See Greene v. Melton,* 54 A.D.2d 1060, 1061, 388 N.Y.S.2d 714, 715 (3d Dept., 1976). In any event Scanlon did stop within minutes on Sixtieth Street, and Flynn has not shown that he did not stop voluntarily. In short, the evidence does not show that Scanlon in fact committed the crime of leaving the scene of the accident.

Nor does the evidence show that Scanlon in fact assaulted Flynn by trying to run him down. Flynn argues, however, that he arrested Scanlon not for assault as a violation of state law, but for assault on a federal officer, a federal crime for which he is authorized to arrest on probable cause. *See* 18 U.S.C. § 111 (1976). Even so, the arrest was not justified, for the evidence shows not only that Scanlon did not in fact assault Flynn, but that Flynn did not have probable cause for believing that Scanlon had assaulted him. Flynn's account of the events at the corner of Sixtieth Street—that Scanlon's car appeared to begin to turn east on Sixtieth, then veered around to the west and, in the process, headed directly at Agent Flynn—was corroborated by a single witness, Bernadette Tracy. Ms. Tracy, however, discussed the incident with Flynn shortly after it happened, and her recollection may have been influenced by his perceptions. In any event, the testimony of three other witnesses indicates that Scanlon's car never even seemed to threaten Flynn. Indeed, one of the three testified that by the time Flynn reached the corner of Park and Sixtieth, Scanlon's car was already one-fourth of the way down Sixtieth towards Madison. Taken as a whole, the evidence does not support a finding that Flynn's belief that Scanlon had attempted to run him down was reasonable.

Flynn has not carried his burden of proving that his arrest of Scanlon was justified: He did not show that Scanlon committed the crimes of driving while intoxicated or leaving the scene of an accident, and he did not show that he had probable cause for believing that Scanlon had assaulted him.

### 4. Malicious Prosecution

█ To prevail on his cause of action for malicious prosecution, Scanlon "must establish that (1) [Flynn] either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Martin v. City of Albany,* 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614, 364 N.E.2d 1304, 1307 (1977); *accord, Broughton v. State,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, 335 N.E.2d 310, 314, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). Flynn argues that Scanlon has proven none of the final three elements: that the criminal action against Scanlon was not terminated in his favor since the charges were dismissed without prejudice, that Flynn did have probable cause for arresting Scanlon, and that Flynn did not act out of malice. We need consider only the last of these contentions, since Scanlon proved nothing at trial that tends to show that Flynn acted out of malice.

█ To prove malice, Scanlon must show that Flynn commenced criminal proceedings against him "due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg,* 44 N.Y.2d 500, 502, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975, 976 (1978). Scanlon suggests that malice can be inferred from the "facts" that Flynn acted recklessly when he fired his pistol, that

Flynn allegedly testified falsely regarding the number of shots he fired and the alleged assault by Scanlon on him, and that Flynn failed to take steps to have the charges against Scanlon withdrawn. The claim that Flynn gave false testimony is inconsistent with the findings set forth in this memorandum. That Flynn may have overreacted when he fired at Scanlon's car, since even by his own account it was obvious by the time he fired that he was in no danger, is not in itself enough to establish malice: certainly Scanlon has not established that Flynn leveled charges against him in order to cover up for the fact that he had acted recklessly. Finally, Flynn's failure to seek to have the charges against Scanlon withdrawn does not establish malice: although Flynn initiated the proceedings against Scanlon, he did not do so in bad faith, and could quite reasonably have assumed that he had no further role to play, except possibly that of witness. There are far more plausible explanations for his failure to follow up on the charges he had brought than ill-will toward Scanlon.

## 5. Damages

Scanlon seeks to recover his medical expenses incurred as a result of the accident, the value of his station wagon, which was not only damaged in the accident but impounded by the New York City Police because of his arrest and never returned to him, the cost of renting a replacement vehicle, and the fees he paid his attorneys for their efforts in defense of the criminal proceeding set in motion by his arrest. In addition, he seeks compensation for "pain, suffering, mental anguish, humiliation" and damage to his reputation.

Flynn is liable only for the harm Scanlon suffered as a result of the arrest. Scanlon cannot recover for his personal injuries or the damage to his car, because he has not shown that the accident was caused by negligence on the part of Agent Flynn.

The car was impounded, however, as a result of the arrest, and consequently Scanlon can recover the value of the car after the collision.[3]

Scanlon cannot recover the cost of defending himself in the criminal proceedings instituted as a result of his arrest because he has not prevailed on his cause of action for malicious prosecution. Under New York law, damages for false arrest "will be measured only to the time of arraignment or indictment whichever comes first." *Broughton v. State*, 37 N.Y.2d 451, 459, 373 N.Y.S.2d 87, 96, 335 N.E.2d 310, 316, *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). The rationale for the rule is that arraignment (or indictment) involves an independent evaluation of the grounds for the charges against the defendant. Detention subsequent to such an evaluation, or costs subsequently incurred, cannot be attributed to the earlier improper arrest, since there has been an independent, supervening determination of probable cause which cuts off the liability of the arrestor. Scanlon does not dispute this reading of the law, but contends that in his case the arraignment should be given no effect. He does not suggest that the arraigning magistrate's determination to continue the charges against Scanlon was not well founded. Instead, he argues that the arraignment was "jurisdictionally defective" because Flynn neglected to sign his deposition supporting the information prepared by Police Officer Clark (who was assigned as the "arresting officer"). Scanlon relies on *People v. Jeffries*, 19 N.Y.2d 564, 281 N.Y.S.2d 67, 227 N.E.2d 870 (1967). There, as here, the information was sworn to by an officer who was not present at the time of the offense, who based the charges in the information on what others had told him. In *Jeffries*, however, it was not clear whether what was told the officer was hearsay or based on first hand knowledge. Consequently, the Court of Appeals held that the trial court lacked jurisdiction to

---

**3.** Arguably, Scanlon should also recover the rental costs for a replacement vehicle that he would not have incurred had his station wagon not been impounded, but it is not clear that such costs are proximate to the improper arrest. Further consideration of this point, however, would be unprofitable in view of our decision to mitigate damages.

entertain the charges. Here, it is quite clear that the information prepared by Officer Clark was based on Flynn's first hand knowledge. On this set of facts, we believe that a New York court would sustain jurisdiction, and we conclude, therefore, that Scanlon's arraignment was effective and did constitute an intervening cause which cuts off liability on the part of Flynn.

Scanlon cannot recover for damage to his reputation because he did not prove that his reputation has suffered as a result of the events of October 6, 1975. He can recover for the suffering, anguish, and humiliation that he experienced between the time of his arrest and that of his arraignment the next day. However, we find that Flynn acted in good faith in arresting Scanlon, even though he did not have probable cause to do so, and "proof of good faith is relevant to the mitigation of damages and where established may result in nominal damages only." *Broughton v. State,* 37 N.Y.2d 451, 459, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, 315, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).

On the basis of the facts found above, we conclude that Donald Scanlon, on account of the humiliation and inconvenience which he suffered between the time of his arrest and arraignment, but bearing in mind, as a mitigating factor, the good faith of Richard Flynn in arresting Donald Scanlon, is entitled to recover from the defendants the sum of $2,500., as well as the market value of his automobile in the condition in which it existed immediately after the collision.

We cannot know and have been unable to determine the causes of the collision on the evening of October 6, 1975. Yet it would be inappropriate to close this opinion without noting that in our estimation both Scanlon and Flynn are honorable men who acted in good faith at all times but whose judgment was inevitably affected by the collision and the commotion that followed it which spread misunderstanding and overreaction and brought harm to both of them.

The above constitutes our findings of fact and conclusions of law.